hLANDRIEU, Judge.
In 1986, a jury found the defendant, Sullivan Walter, guilty of forcible rape, aggravated crime against nature (two counts), and aggravated burglary. The convictions and sentences, as amended, were affirmed, but this Court remanded the case to the district court to provide Walter with an opportunity to file a motion for new trial based upon a claim of newly-discovered evidence, reserving his right to appeal the district court’s ruling *440 on the motion. State v. Walter, 514 So.2d 620 (La.App. 4th Cir.1987). A hearing on the motion commenced April 8, 1988; the district court denied the motion on July 1, 1988. Thereafter, this Court found no error in the district court’s denial of the motion for new trial, affirmed Walter’s convictions, amended the sentences, and affirmed them as amended.[1] State v. Walter, 94-2221 (La.App. 4th Cir. 5/29/96), 675 So.2d 831. The Louisiana Supreme Court granted Walter’s writ application and remanded the case to this Court to apply the correct standard for determining the materiality of the evidence untimely disclosed by the State. State v. Walter, 96-1702 (La.6/20/97), 695 So.2d 1340.
Walter argued in his initial appeal, and continues to do so, that his conviction should be reversed because the State did not produce results of a laboratory analysis of a seminal fluid stain found on the victim’s shorts until the day of trial. He asserts the State effectively suppressed favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by its untimely disclosure of the laboratory report. Although the report was not admitted in evidence, the police criminalist who had performed the analysis and prepared the report testified as to its contents. Discussed more fully below, the test results showed the perpetrator as being a non-secretor, one of the group that composes only twenty percent of the population. Therefore, Walter argues, there was an eighty percent chance he was not the perpetrator and, had he known about the test results earlier, he would have conducted tests to exonerate himself by proving that he is a secretor.
In United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the Supreme Court held that favorable evidence is material, and constitutional error results from its suppression by the State, “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.”
In Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citations omitted), the Supreme Court explained that
13a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of a reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). Bag-ley’s, touchstone of materiality is a “reasonable probability” of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is accordingly shown when the government’s evidentiary suppression “undermines confidence in the outcome of trial.”
Quoting Kyles and, in turn, Bagley, the Louisiana Supreme Court instructed this Court to determine “whether, as the result of the State’s untimely disclosure, the inability of the defense to place [before the jury] all evidence relevant to the reliability of the victim’s identification testimony ‘undermines confidence in the outcome of trial.’ ” Walter, 96-1702, p. 1, 695 So.2d at 1341 (citations omitted). Mindful that the test is not suffi- *441 eiency of the evidence, see Kyles, 514 U.S. at 434, 115 S.Ct. at 1566, we affirm Walter’s convictions.
The only genuine issue at trial was that of identity; consequently, the essence of the State’s case was the victim’s identification of Walter as the perpetrator. The victim testified that the windows of her home were open while her eight-year-old son was sleeping in his bedroom and she was taking a shower in her rear bathroom. A man stepped into the doorway wearing a yellow rag over his face and carrying a knife. She described the man as wearing blue jeans, white tennis shoes, a beige or tan shirt, and a blue hat on backwards. Though she struggled against him, he pushed her back into the shower and stuck a yellow shirt over her head. He ordered her to be quiet and threatened harm to her and her child. The man next pulled her into her lighted bedroom, which was empty of furniture because she had just cleaned the carpet. The man locked the door and shut the windows. He ordered her to fellate him, but he did not ejaculate. He ordered her Uto lie down and performed cunnilingus on her. While on her back, she was able to see his face for several minutes. He then proceeded to have vaginal intercourse with her on the bedroom floor while the knife remained within his reach. The man, with nothing covering his face, was six to seven inches from her. During intercourse, the man ejaculated. Thereafter, he put his clothes back on and left the house. The victim ran back to the bathroom, where she remained for about ten minutes before calling the police. She dressed in a top and shorts while waiting for the police.
The victim described the perpetrator as brown-skinned, tall, between five-nine and five-eleven, slender, about 145 pounds, and young, between eighteen and twenty-two. His hair, which she described as greasy, was styled in a “Jheri curl.” He wore a blue baseball cap on backwards. She identified a cap confiscated from Walter at the time of his arrest as the one he had been wearing the night of the rape. Shown a photograph of Walter taken at the time of his arrest depicting him wearing the cap backwards, the victim stated that he had been wearing it in the same manner on the night of the rape.
Four days after the incident, she assisted a police artist in making a composite sketch of the man who had raped her. During the process, she looked at many different features, such as eyes, noses, mouths, chins, and shapes of faces. Some weeks later, a police officer recognized the defendant fi’om the composite and provided Detective Spong with his name. Spong compiled a photographic line-up including Walter’s photograph. On June 26,1986, the victim selected Walter’s photograph without any coercion or influence and positively identified him as the perpetrator. At trial on December 2, 1986, the victim identified Walter as the man who had raped her at knife point on May 10,1986. She stated that there was no doubt in her mind that Walter was the man who had raped her.
IsThe State also presented the testimony of Harry O’Neal, a criminalist who was qualified as an expert in the analysis of bodily fluids. He had examined the top and shorts worn by the victim. He testified that his examination of a stain on the victim’s shorts revealed the presence of seminal fluid containing spermatozoa. Further analysis of the seminal fluid stain “revealed no secretor activity which would indicate that the individual who left the seminal fluid stains was a non-secretor.” He explained that eighty percent of the population may be deemed “secretors” because their blood type may be determined from saliva or bodily fluids. On cross-examination, he stated that he was unable to determine a blood type because the tested stain revealed no secretor activity.
At the hearing on the motion for new trial, O’Neal testified that a blood sample and saliva sample taken from Walter and examined by O’Neal before the hearing revealed that Walter was a “Group B secretor.” He acknowledged that his earlier tests of the victim’s top and shorts had indicated that the seminal fluid stain found on the victim’s shorts had shown no secretor activity. He explained that the stain had contained no blood group substances which could be identified through the testing procedure. He maintained that the report did not conclude *442 that the depositor of the stain was a non-seeretor, but he acknowledged that such was one of the possibilities. He testified that an individual’s non-secretor status could not be determined from a stain garnered under these circumstances. That determination, he said, must be made through blood-typing of the individual to determine Lewis antigens as well as by testing a saliva sample.
O’Neal set forth several possible reasons for his inability to detect blood group substances in the stain found on the shorts. First, the area tested for secretor activity may have been of insufficient size, because it is a portion of the remainder of the original stain after testing for the presence of seminal fluid and spermatozoa. Second, the examined stain may have resulted from a mixture of | fiSeminal and vaginal fluids such that the stain residue could have been too diluted to reveal any blood group substances. Lastly, the stain portion to be tested may have been clipped from outside the original realm of the stain. O’Neal opined that, based on the test results, Walter could not be excluded as the source of the seminal fluid. He emphasized that his testimony at trial in December of 1986 would have been the same had he known the results contained in both lab reports.
Walter is correct that he would have been better-situated to assert a defense of mistaken identity had he been able to show jurors that the test results of the stain found on the victim’s shorts indicated the perpetrator had been a non-secretor, whereas he was a secretor along with eighty percent of the population. We cannot, however, reasonably conclude that Walter’s case would have been “markedly stronger” or that the State’s ease would have been “markedly weaker” in the presence of both the untimely-disclosed evidence and any other evidence to which the lab results may have lead the defense. Kyles, 514 U.S. at 440, 115 S.Ct. at 1569. The inconclusive nature of the secretor test results leaves the victim’s identification testimony unsullied. As O’Neal testified at the hearing, the test results did not rule out the possibility that the perpetrator was a se-cretor and, therefore, the results did not eliminate Walter as a suspect. Though the defense attempted at trial to cast doubt on the victim’s identification, such efforts were decidedly unsuccessful.[2] Given the strength of the victim’s testimony, no reasonable probability exists that the secretor evidence would have compromised the reliability of the victim’s identification of Walter as the man who had raped her. Consequently, we do not find that the constraint placed upon the defense by [7the State’s untimely disclosure undermines confidence in the outcome of Walter’s trial.[3]
Accordingly, we affirm Walter’s convictions and sentences, as previously amended.
AFFIRMED.

. On December 16, 1986, the district court sentenced Walter on the forcible rape count to serve thirty-five years at hard labor, the first two years to be served without benefit of parole. On the remaining counts, the district court sentenced him to serve fifteen years at hard labor without benefit of parole. The sentences are to run concurrently. On April 7, 1987, the district court vacated the forcible rape sentence and sentenced Walter as a multiple offender to serve thirty-five years at hard labor without benefit of parole for the first half of the sentence and without benefit of good time. On May 29, 1996, this Court amended the forcible rape sentence to delete the denial of good time and amended the aggravated burglary sentence to delete the restriction on parole.

. Defense counsel on cross-examination of the victim tried to exploit several minor discrepancies between the description of the perpetrator contained in the police report and her description of the perpetrator as she remembered it.

. Additionally, in his trial testimony, O'Neal only noted that the test results indicated that the perpetrator was a non-secretor. He did not testify that the defendant was a non-secretor. Indeed, no testimony at trial, either directly or indirectly, linked the defendant to the perpetrator through secretor status or blood type. Thus, the State did not unfairly capitalize on the late disclosure of the test results.