STATE of Wisconsin, Plaintiff-Respondent,

v.

Terrance W. WALTHER, Defendant-Appellant.

Court of Appeals

*No. 99–2058–CR. Submitted on briefs November 7, 2000.—Decided December 19, 2000.*

## 2001 WI App 23

(Also reported in 623 N.W.2d 205.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Raymond M. Dall'osto* of *Gimbel, Reilly, Guerin & Brown,* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *David J. Becker,* assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. Terrance W. Walther appeals from the trial court's nonfinal order denying his motion for an *in camera* review of confidential records of the child whose complaint led to criminal charges against him.[1] Walther argues that the trial court erred in concluding that this court, in *State v. Munoz,* 200 Wis. 2d 391, 546 N.W.2d 570 (Ct. App. 1996), and *Jessica J.L. v. State,* 223 Wis. 2d 622, 589 N.W.2d 660 (Ct. App. 1998), "impose[d] a heightened threshold showing of relevance, materiality and necessity for disclosure for a fair determination of guilt or innocence," in contrast to the threshold established in *State v. Shiffra,* 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), for a defendant seeking an *in camera*

---

[1] By order of December 3, 1999, this court granted Walther's petition for leave to appeal the trial court's order, concluding that Walther's petition met the criteria for interlocutory review. *See* WIS. STAT. § 808.03(2)(c) (1997–98).

review of the records. He argues that, under *Shiffra* and its progeny, his showing was sufficient. Walther is correct and, accordingly, we reverse.

## I. BACKGROUND

¶ 2. The State's corrected criminal complaint and information charged that on December 17, 1998, Walther committed second-degree sexual assault of a child, second-degree sexual assault (force or violence), and child enticement. The complaint alleged:

> [The alleged victim] reported that he is 13 years old . . . and on approximately [December 17, 1998], the defendant invited him into his van to go to a Walmart store in the southwest corner of the county and then return to their place of departure in the northeast corner of the county. After Walmart, instead of taking [the child] back to the place of departure, the defendant stopped the van . . . near Walmart's and forced [him] to the back of the van and told him that if he told anyone, he (the defendant) was going to kill him . . . . In the back of the van, the defendant fondled [the child's] genitals and held him down forcibly and put his (the defendant's) mouth on [the child's] penis and also licked his buttocks, all without his consent.

¶ 3. The defense filed a "Motion for *In Camera* Review of Medical, Psychological, Psychiatric, Residential Treatment and Counseling Records." In support of the motion, defense counsel submitted an affidavit stating, in part:

> After reviewing the discovery materials provided to me to date, it appears that the alleged victim . . . has had various contacts with the law enforcement re: problems at St. Aemilian-Lakeside,

621

[a residential treatment facility] where he resided in 1998–99.

Darryl Stegall, . . . a potential witness identified in police reports, has advised our investigator, Charles Hess, that he has known [the alleged victim] since May, 1998.

Stegall advises that [the child] was frequently AWOL from St[.] Aemilian's and in December, 1998, [the child] advised Stegall that he had been sexually assaulted by a staff member at St. Aemilian's.

My investigator has spoken with Anthony Hammond, . . . [who] also knows [the child].

Hammond recalls [the child] being AWOL from St. Aemilian's on numerous occasions. Hammond advised our investigator that [the child] indicated that the reason[ ] he would go AWOL was because he was being abused and beaten by staff at St. Aemilian's.

Hammond advised our investigator that he recalls seeing [the child] with a bruised or black eye in December, 1998. Hammond asked how he got the bruising and [the child] told him that he had gotten it in a fight with a staff member at St. Aemilian's.

Police reports provided to the defendant in the course of discovery in this case indicate that [the child] told police that he got the bruised forehead and black eye in December, 1998 from being struck by the defendant, Terrance Walther.

It is my understanding that [the child] resided at St. Aemilian's in 1998 and 1999. I do not know if he continued to be assaulted there, or if any complaints or reports of abuse or his medical condition were compiled by St. Aemilian's.

I am aware from *Milwaukee Journal / Sentinel* articles in the past two years that sexual assaults of the residents at St. Aemilian's have occurred. . . .[2]

I believe that [the child's] psychiatric, medical and residential treatment records are highly relevant to [his] credibility, perception and recall, all of which will be at issue at Walther's trial, and that

---

[2] The affidavit attached copies of *Milwaukee Journal Sentinel* articles of May 12 and 15, 1997, which reported, among other things: (1) "[s]tate officials" had "cited" St. Aemilian-Lakeside "in two incidents of sexual abuse among boys"; (2) a Milwaukee County report on one of the incidents "criticized [St. Aemilian-Lakeside] for not reporting the assault to police and for not appropriately intervening with medical examinations after the incident was discovered"; (3) "[t]he two citations come months after [St. Aemilian-Lakeside] was cited . . . for an incident of sexual abuse involving two children and criticized by officials for not immediately reporting it to Child Protective Services, as required by law"; (4) the president of St. Aemilian-Lakeside said that "[m]any of the current residents were victims of sexual abuse or perpetrators of sexual abuse before they arrived, . . . making them more likely to act out sexually while in treatment," and that "more than half of the residents . . . have been sexually abused"; (5) "[i]n a review of its records this week, St. Aemilian-Lakeside found that 80% of current residents had been either sexual victims or sexual offenders"; and (6) children involved in the sexual abuse incidents referred to in the articles included those who were twelve and thirteen years old.

We detail some of the information in the articles not to attest to the articles' accuracy, but rather, to more fully present the relevant information submitted to the trial court for its consideration of Walther's motion. We do not cite these articles to imply any criticism of St. Aemilian-Lakeside, or of its predecessor entities which, one of the articles also noted, "for years" had been "widely respected for caring for some of Wisconsin's most troubled children."

disclosure of such may also lead to exculpatory evidence.

Disclosure of the requested materials are [sic] absolutely critical to Walther's defense.

This affidavit is executed in support of Walther's motion to compel production for *in camera* review by the court and release of said documents to defense counsel, so Walther and his counsel can effectively prepare for trial.

(Footnote added.)

¶ 4. Defense counsel's brief in support of the motion clarified the basis for Walther's request for an *in camera* review. The brief, in part, explained:

The purpose of this review is to determine whether:

1. [the child] made other true or false allegations of sexual assault or unwanted sexual contact against any other persons, including staff at St. Aemilian-Lakeside, Inc.

2. . . . [the child's] allegations against Walther resulted from any improper suggestion by another, fear of reprisal from staff or residents at St. Aemilian's, or arose from a mental disease or deficiency he was suffering from; and

3. . . . [the child's] mental condition may impact on his recollection, perception and credibility.

Walther recognizes the sensitivity of such records; however, given the nature and gravity of the charges against him and the fact that [the child] had a long, troubled history, was placed in foster care and residential treatment due to irregular

behavior and/or dysfunctional family situations, it is very likely that such records would contain information material and necessary to Walther's defense[.] [The child's] statements to associates, as outlined in the Affidavit of [counsel], are further grounds showing a need for disclosure. Whether [the child] may have made allegations of sexual assault in the past (true and false), whether he was the victim of sexual assault or abuse while at St. Aemilian['s] in 1998–99, and whether his sexual assault allegations against Walther resulted from any improper suggestion by any medical or mental health professional, threat from staff or residents[,] and any other exculpatory information are concerns that can only be addressed by disclosure of documents.

¶ 5. At the trial court hearing on the motion, the State opposed Walther's motion, contending that "the defense has not met its burden of establishing materiality." The defense countered that the State had "confused the standards the court has to really apply." Defense counsel contended, "It's not a standard of whether [the requested information is] probably material or is material, but [rather, whether it] might be helpful and material in order for the court to go to that next step" and review the records *in camera* to determine whether they included "material and relevant evidence."

¶ 6. The defense then supplemented its brief and affidavit by submitting Child Protective Services records from the State of Washington which, defense counsel explained, caused him "further concerns relative to the ability of the alleged victim in this case to accurately perceive and relate back what occurred to him as well as to his mental condition and stability." The defense, conceding that "just having a troubled

history or having some kind of counseling background is not enough," then also submitted a packet of materials, explaining:

> But what we have presented to the court both in my affidavit as well as in the packet I have just submitted, at the first part of that packet is [sic] the actual statements obtained from acquaintances of the victim which, as the court has inquired of [the prosecutor], indicates [sic] that the victim has told police that my client sexually assaulted him in December of '98, he has told his acquaintances he was assaulted by staff at St. Aemilian[']s in December of '98, he has told police in the discovery I have reviewed that it was Mr. Walther who hit him and caused him the bruise on his face in December of '98, yet he has told acquaintances that staff did this, and now apparently according to [the prosecutor] today he is conceding that staff or someone else did it other than Mr. Walther.[3]

(Footnote added.) Thus, defense counsel maintained: "We have here very fact-specific statements . . . which specifically relate in time, place, and manner to the actual offense. I think this goes to the very core of what would be considered exculpatory evidence or at least potentially so."

¶ 7. The prosecutor disputed the defense assertion that the child had given inconsistent statements. The prosecutor maintained that, in the child's alleged statements holding both Walther and a St. Aemilian's staff member responsible for the bruise or bruises suf-

---

[3] Later in the hearing, defense counsel elaborated that "in that packet" were "the full investigative reports of the statements of the [child's] two acquaintances that were made to my investigator" regarding the child's alleged assertion that he had been "assaulted by someone other than [Walther]."

fered in about December 1998, "[t]wo separate things are alleged to have occurred." Later in the hearing, however, the prosecutor conceded, "We don't know whether it's the same bruise." Defense counsel then declared:

> That's exactly my point which is why I believe we have a right, we have made [sic] that necessary burden, the threshold burden for the court to access these records and then determine this, because if it is the same bruise, it's highly relevant. If it isn't the same bruise, the [S]tate may be correct at this point; and it becomes immaterial to the defense.
>
> However, we don't know that now; and to allow the case to go forward without access to this potentially exculpatory evidence violates *Shiffra* as well as *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] and *Kyles* [*v. Whitley*, 514 U.S. 419 (1995)].
>
> . . . and I would supplement what is stated in the affidavit with the additional references to the Washington State [dependency petition] action which goes again to perception, ability to recall. We don't know if the alleged victim had been ingesting controlled substances or alcohol in December of '98. The medical records, if he has been treated, would clearly show that which may be relevant, too, to his perception and ability to recall.[4]

---

[4] The Washington dependency petition alleged that between August 1990 and May 16, 1995, the child's mother had "smok[ed] pot with all three [of her] children" and "giv[en] wine coolers to all three." Earlier in the hearing, the prosecutor conceded that the materials from Washington were "not as vague and completely unfounded" as those considered in *Jessica J.L. v. State*, 223 Wis. 2d 622, 589 N.W.2d 660 (Ct. App. 1998), but contended that they still fell "far short of what is required by both *Jessica* and [*State v.*] *Shiffra*[, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993)]."

(Footnote added.)

¶ 8. Denying Walther's motion, the trial court opined that this court, as reflected by the decision in *Jessica J. L.*, is "very deferential to the privacy interests that people have in their psychiatric or counseling records." While indicating that it was "sympathetic to the [defense's] position," given the obstacles to obtaining "the kind of information that's needed to make that showing of materiality" necessary to merit an *in camera* review, the trial court concluded that Walther had failed to make the necessary showing. In its order, the trial court further clarified the basis for its decision, stating that "the *Jessica J.L.* and *Munoz* decisions impose a heightened threshold showing of relevance, materiality and necessity for disclosure for a fair determination of guilt or innocence before *in camera* disclosure can be ordered under *Shiffra*, and that the defendant has not met that heightened threshold."

## II. DISCUSSION

¶ 9. As we have explained:

> "To be entitled to an *in camera* inspection, the defendant must make a preliminary showing that the sought-after evidence is material to his or her defense. We review under the clearly erroneous standard the findings of fact made by the trial court in its materiality determination." Whether a defendant has made the required preliminary showing presents a question of law.

*Munoz*, 200 Wis. 2d at 395 (citation omitted). In the instant case, although the parties express differing views of what the records might show, they do not challenge any of the trial court's factual findings. The trial court properly evaluated Walther's motion by acknowledging that it would "assume that the informa-

tion that's contained in the affidavit is true and that if [it] were to look at the records [it] would find that kind of information."

¶ 10. In *Munoz*, this court carefully traced the language in *Shiffra* in order to clarify, not alter, the *Shiffra* standard. In *Munoz*, we acknowledged that, in *Shiffra*, the contrast between two articulations of the standard—"may be helpful to the defense," and "may be necessary to a fair determination of guilt or innocence"—could cause confusion. *See Munoz*, 200 Wis. 2d at 397–98. Thus, in *Munoz*, we explained:

> The broad language of *Shiffra*—"that the sought-after evidence is relevant and *may be helpful* to the defense," *Shiffra*, 175 Wis. 2d at 608, 499 N.W.2d at 723 (emphasis added)—certainly would seem to suggest a very low threshold for a defendant to establish the basis for an *in camera* inspection. A closer reading of *Shiffra*, however, reveals that a defendant must establish more than "the mere possibility" that psychiatric records "may be helpful" in order to justify disclosure for an *in camera* inspection.
>
> . . . [A]lthough *Shiffra's* reference to information that "is relevant and *may be helpful to the defense*" could cover almost anything the defense sought to discover, *Shiffra* did not repeat the "may be helpful" language elsewhere in the opinion but, instead, reiterated the standard: "may be necessary to a fair determination of guilt or innocence." *Shiffra*, 175 Wis. 2d at 610, 400 N.W.2d at 723 (emphasis added).

*Munoz*, 200 Wis. 2d at 397–98. *Jessica J.L.*, relying on both *Shiffra* and *Munoz*, expressed nothing that would alter either the *Shiffra* standard or the *Munoz* clarification. *See Jessica J.L.*, 223 Wis. 2d at 627–29, 632–34.

¶ 11. Here, Walther established more than the mere possibility that the requested records "may be necessary to a fair determination of guilt or innocence." *See Shiffra*, 175 Wis. 2d at 610. The information Walther provided, both in counsel's affidavit and supplemental submissions, about the child's background and treatment history, in combination with the information about the reported sexual assaults at St. Aemilian's, established more than the mere possibility that the requested records would reveal information necessary to a fair determination of guilt or innocence. *See State v. Ballos*, 230 Wis. 2d 495, 499–501, 602 N.W.2d 117 (Ct. App. 1999) (trial court erred in denying request for *in camera* review where, "[t]aken together, the treatment, the timing [of the treatment in relationship to the crime], and the apparent potential relationship among the [treatment foci and the crime] provided more than 'the mere possibility' that [the defendant's] treatment records ' "may be necessary to a fair determination of guilt or innocence" ' "), *review denied*, 2000 WI 21, 233 Wis. 2d 84, 609 N.W.2d 473.

¶ 12. Additionally, the information regarding the child's accounts—of whether Walther or a St. Aemilian's staff member was responsible for the bruise or bruises suffered at or near the time of the alleged crimes—was relevant to the child's credibility, generally, and to the child's allegations against Walther, specifically. The trial court understood the relevance and significance of this information but, curiously, did not carry that understanding to its logical conclusion. Denying Walther's motion, the court commented:

> [T]o the extent that the child may have lied when he told someone else that he got that other bruise from

> a fight with a member of St. Aemilian[']s, all of that
> seems to me like fertile ground for cross-examina-
> tion at trial rather than something that rises to the
> level of materiality for me to think that this child
> cannot perceive the truth or relate the truth and
> that there is something in some sort of record that
> would be supportive of that.

Indeed, such information was potentially fertile ground for cross-examination and, for that very reason, the records documenting both that and related information were material to a fair determination of guilt or innocence.

¶ 13. Thus, Walther's showing stands in sharp contrast to that considered in *Munoz*, where we affirmed the denial of a defendant's request for an *in camera* review of a sexual assault victim's mental health records in part because the defendant had offered "nothing to suggest that . . . [the victim's] experiences or counseling in any way compromised her credibility." *Munoz*, 200 Wis. 2d at 400. Similarly, Walther's showing was far more specific and substantial than that in *Jessica J.L.* where, we explained, an *in camera* review of a child's counseling records was not required, in part because defense counsel's motion "[did] not offer any facts, which if true, would show that there was exculpatory information in the records sought," *Jessica J.L.*, 223 Wis. 2d at 626–27, and defense counsel's representations did not provide "any allegation which, if believed, would tend to prove that [the child] has a psychological disorder that would make her a poor reporter of events relating to sexual conduct or draw her credibility into question in any way," *id.* at 635.

¶ 14. In the instant case, the trial court commented that its decision to deny Walther's request for

*in camera* review was a "close call." Recognizing the obvious difficulties in discerning the details of nondisclosed confidential records,[5] we caution trial courts to carefully consider, in cases presenting "close call[s]," the consequences of cutting off *in camera* review. As emphasized in *Shiffra*, and as reiterated in *Munoz*, a trial court's *in camera* review "is a limited intrusion that often provides 'the best tool for resolving conflicts between the sometimes competing goals of confidential privilege and the right to put on a defense." *Munoz*, 200 Wis. 2d at 400 (quoting *Shiffra*, 175 Wis. 2d at 611–12).

*By the Court.*—Order reversed.

[5] In the instant case, the trial court expressed an understanding of those difficulties, stating:

> And to some extent I'm sympathetic to the position that you are in, [defense counsel], because in order to even get the court to look at the records, you have got to make some kind of a showing which supports materiality. But in a case where there is . . . a stranger assault alleged and relatively little is known about the victim, it's very difficult for the defense to get the kind of information that's needed to make that showing of materiality.