J-A02007-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JOSE LOUIS NEGRON | No. 1165 MDA 2015 |

Appeal from the Order Entered June 8, 2015
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0003826-2014

BEFORE: PANELLA, J., STABILE, J., and FITZGERALD, J.[*]

MEMORANDUM BY FITZGERALD, J.:         **FILED JANUARY 04, 2017**

The Commonwealth appeals from the order entered in the Berks County Court of Common Pleas, which granted Appellee's, Jose Louis Negron, second amended post-sentence motion *nunc pro tunc*, vacated his judgment of sentence, and ordered a new trial based on after-discovered evidence. We are constrained to reverse.

The evidence presented at Appellee's trial on charges of murder and related offenses is known to the parties and need not be recited at length for the purposes of this appeal. It suffices to note that in the early morning hours of June 21, 2014, Appellee was among a group of males who assaulted Luis Angel Rosario-Rosario ("Decedent") outside of Decedent's

---

[*] Former Justice specially assigned to the Superior Court.

apartment building in the City of Reading. During the confrontation, several shots were fired. Decedent suffered a mortal gunshot wound to the neck. The confrontation outside the apartment building allegedly resulted from a previous fight involving four women, including Appellee's girlfriend, Zulieka Baez-Cintron and Ashley Bruno. Ashley Bruno was dating the brother of Baez-Cintron's former paramour and lived at the same apartment building as Decedent.

Appellee was charged on July 7, 2014, with first-degree murder[1], third-degree murder[2], and two counts of aggravated assault.[3] On July 11, 2014, Appellee was denied bail. The Commonwealth proceeded to trial against Appellee beginning on January 12, 2015. The Commonwealth asserted that Appellee was the shooter, as well as an accomplice theory. On January 15, 2015, the jury found Appellee guilty of all charges. On January 20, 2015, the trial court sentenced Appellant to life imprisonment. Appellee timely filed a post-sentence motion, which the court denied on January 29, 2015.

The present appeal arises out of information obtained by the Berks County Police Department on December 22, 2014, twenty-one days before

---

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 2502(c).

[3] 18 Pa.C.S. § 2702(a)(1) and (4).

Appellee's trial. Specifically, on December 22nd, Berks County Detectives John Lackner and Pasquale Leporace interviewed a confidential source ("CS") seeking favorable treatment based on information about a homicide. According to Detectives Lackner, the CS indicated "that sometime in June, 2014, a male who he knows as 'Jay' had told him that he had shot someone because an unidentified person had jumped a person that he identified as Twin . . . ." N.T., Post Sentence H'rg, 3/19/15. The CS "wasn't sure" where the shooting occurred, but that it "may have been behind the West Reading Diner located in West Reading, Berks County, Pennsylvania." The CS described Jay as "a Hispanic male with a bushy beard." *Id.* Based on the CS's description, Detectives Lackner and Leporace believed "Jay" was Jaime Gonzalez-Flores, also known as "Al Qaida Jay." *Id.* at 6, 19. However, the detectives did not present the CS with a photograph of Gonzalez-Flores for identification because of a computer malfunction. *Id.* at 6. Detective Lackner believed that the CS's information related to Appellee's case. At the conclusion of the December 22, 2014 proffer, Detective Lackner contacted Detective Eric Driesbach, the lead investigator in Decedent's homicide, and relayed the substance of the CS's statement.[4]

---

[4] Detective Driesbach testified at trial that he was not able to identify the other individuals who, along with Appellee, went to the Decedent's apartment building and confronted Decedent. Moreover, the detective, during cross-examination, asserted that he believed Appellee shot Decedent.

J-A02007-16

On February 17, 2015, twenty-eight days after sentencing, Detective

Driesbach prepared the following report:

> On, Friday, February 13, 2015 I was contacted by First Assistant District Attorney Dennis SKAYHAN from the Berks County District Attorney's office. ADA SKAYHAN requested that I document information that I had received from Detective John LACKNER of the Berks County Detectives in regards to a possible suspect in this case.
>
> Approximately two weeks prior to the week of January 12, 2015 I received a telephone call from Detective LACKNER. Detective LACKNER stated he had conducted an "off the record proffer" with a cooperating source, here after referred to as CS. The CS indicated that he had a conversation with a male whom he knows by the name of "Al Queda Jay.[5]" According to Detective LACKNER the CS did not know the real identity of this male. "Al Queda Jay" [allegedly] told the CS that he was the one who shot the victim. "Al Queda Jay" allegedly told the CS that [Appellee[6]] was present but not the shooter. It is unknown where this conversation occurred between the CS and "Al Queda Jay." Detective LACKNER told me that he believed "Al Queda Jay" may possibly be a Jaime Gonzalez. Detective LACKNER could not recall a date of birth. I thanked Detective LACKNER for the information and our conversation ended.
>
> I searched RMS, the Reading Police Department Reporting System, for any contacts by the name of Jaime GONZALEZ and located eight (8) different potential contacts. These contacts had different dates of birth listed and some had no dates of birth listed by different home

---

[5] The record reflects various spellings of Gonzalez-Flores' purported nickname as "Al Qaida Jay" and "Al Queda Jay."

[6] Although the report indicated "Al Qaida Jay" referred to Appellee as "Twin," Detective Driesbach testified that Appellee's name was never mentioned and he merely assumed Appellee was "Twin," as Appellee's case was the only homicide the police were aware had occurred in June 2014. N.T. Post-Sentence Hr'g at 39.

- 4 -

addresses. I then searched for any contacts with the nickname/moniker of "Al Queda Jay." There were no contacts located. I then searched for any contacts with the nickname/moniker of just "Jay." I located (71) separate contacts. I then searched for contacts with the nickname/moniker of "J." There were (38) separate contacts. I then searched any contacts with the nickname/moniker of just "Al Queda." There were no contacts located. Of the contacted located with the nickname/moniker of "Jay" or "J," none of these contacts true identities were Jaime GONZALEZ. The true identity of the individual that the CS refers to has not been able to be located.

No other action taken.

N.T. Post-Sentence Hr'g at 45, Defense Exhibit 1.

On February 18, 2015, the trial court vacated its initial order denying Appellee's post-sentence motion and ordered him to file an amended motion within ten days. Appellee timely filed two amended post-sentence motions *nunc pro tunc*, alleging he was entitled to a new trial based on the after-discovered evidence. The Commonwealth filed a response, and the court conducted a hearing on March 19, 2015.

On June 8, 2015, the trial court granted Appellee's motion for a new trial. The Commonwealth timely filed a notice of appeal on July 6, 2015. The following day, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the Commonwealth timely complied on July 17, 2015.

The Commonwealth raises the following issue for our review:

Did the trial court err in granting a new trial based upon after-discovered evidence which was not material or

exculpatory, and thus would not have altered the outcome
of trial?

Commonwealth's Brief at 4.

The Commonwealth argues the trial court erred in granting Appellee a new trial because there was no indication that the CS's statement pertained to the shooting of Decedent. The Commonwealth asserts that the record does not support the court's conclusion that Appellee could be Twin, the incarcerated person to whom Jay was referring when talking to the CS. Moreover, the Commonwealth notes that the CS believed the shooting discussed by Jay occurred in West Reading. The Commonwealth further contends that even if Jay relayed information concerning the shooting of the Decedent, a new trial was not warranted because the jury could have found Appellee guilty based on an accomplice theory of liability. For the reasons that follow, we are constrained to conclude the Commonwealth is entitled to a reversal of the order for a new trial.

Our review of a claim of a violation of **Brady v. Maryland**, 373 U.S. 83 (1963), is governed by the following principles:

> To establish a violation of **Brady**, a defendant is required to demonstrate: (1) evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. **Commonwealth v. Lambert**, [ ] 884 A.2d 848, 854 ([Pa.] 2005); **see also Kyles v. Whitley**, 514 U.S. 419, 433–34, [ ] (1995) (evidence is material under **Brady**, and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that had the evidence been

disclosed the result at trial would have been different.). Conversely, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." In determining whether a "reasonable probability" of a different outcome has been established, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Thus, a "reasonable probability" of a different result is established when the government's suppression of evidence "undermines confidence in the outcome of the trial." Importantly, "in order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." In engaging in this analysis, a reviewing court is not to review the undisclosed evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record.

***Commonwealth v. Dennis***, 17 A.3d 297, 308-09 (Pa. 2011) (some citations omitted).

Initially, we agree with the trial court that the Commonwealth's assertions that the CS could not have been discussing the shooting of Decedent are meritless. As noted by the trial court, nothing in the detectives' summaries of the CS's statements establish that the individual the CS referred to as "Twin" was incarcerated in June 2014. Accordingly, the Commonwealth's assertion that Appellee, who was taken into custody in July 2014, could not be "Twin" lacks merit. Moreover, although the CS believed the shooting occurred in West Reading, the detectives were aware that the killing of Decedent was the only homicide in Reading in June 2014.

Thus, we conclude that the trial court appropriately determined that detectives and the prosecutor were aware that the information could have been relevant to the defense.

However, the CS's information could only be favorable to Appellee if it indeed related to the shooting for which he was convicted. **See Commonwealth v. Antidormi**, 84 A.3d 736, 747 (Pa. Super. 2014) (stating "[t]he mere possibility that an item of undisclosed information might have helped the defense . . . does not establish materiality in the constitutional sense" (citation omitted)). In this regard, we are constrained to note that the information was passed through multiple layers of hearsay, *i.e.*, from Jay to the CS, from the CS to Detectives Lackner and Leporace, and from Detective Lackner to Detective Driesbach. The CS was unsure of the location of the shooting Jay described. Moreover, although Detective Lackner believed the CS's information related to Appellee's case, and Detective Driesbach believed the CS was discussing a shooting in June 2014, it is unclear whether the CS spoke with "Jay" in June 2014, or whether "Jay" told the CS the shooting occurred in June 2014. **See** N.T., Post Sentence H'rg, at 7. Therefore, without further evidence linking the two events, we cannot conclude that Jay was discussing the shooting in Appellee's case when he spoke to the CS. Consequently, we are constrained to conclude that the information withheld by the Commonwealth could have been used to impeach Detective Driesbach, illuminate a flaw in the investigation, or to

establish a defense based on the fact that someone else escalated the altercation and shot Decedent. We admonish the Commonwealth's failure to disclose this information to Appellee prior to trial. However, we cannot conclude the information relied on by Appellee established his right to a new trial. Accordingly, we reverse the trial court's order vacating Appellee's judgment of sentence and granting him a new trial.

Order reversed. Judgment of sentence reinstated. Jurisdiction relinquished.

Judge Stabile joins the memorandum.

Judge Panella files a concurring statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/4/2017

- 9 -